Strafford,
No. 4268.

STATE *v.* ROMEO OUELLETTE.

Argued February 2, 1954.

Decided March 2, 1954.

*Louis C. Wyman,* Attorney General, *John Brant,* county solicitor, and *Elmer T. Bourque,* Law Assistant (*Mr. Bourque* orally), for the State.

*Alfred Catalfo* and *Robert Shaw* (*Mr. Shaw* orally), for the respondent.

DUNCAN, J. The issue of the respondent's guilt or innocence was submitted to the jury under the following sections of R. L., *c.* 455, both of which were read to the jury:

"8. FIRST DEGREE. Manslaughter, not being murder, nor excusable nor justifiable homicide, is of the first degree when perpetrated with a design to effect death, or when perpetrated without such design by a person engaged in the commission of any offense, or by two or more persons, or by a person bearing any deadly weapon, either open or concealed, or when perpetrated in a cruel or unusual manner, or by means of any deadly or dangerous instrument.

"9. SECOND DEGREE. Every killing of one human being by the act, procurement, or culpable negligence of another, which is not murder, nor excusable nor justifiable homicide, nor manslaughter of the first degree, is manslaughter of the second degree."

By the verdict of guilty of manslaughter of the second degree (see R. L., c. 455, s. 10), the respondent was acquitted of the charge of manslaughter perpetrated while he was engaged in commission of either of the statutory offenses commonly known as reckless driving, and driving under the influence. With respect to manslaughter of the second degree the Trial Court, after reading section 9 of the statute and defining "negligence" and "culpable" instructed the jury in part as follows: "It is apparent that culpable negligence is a higher degree of negligence than ordinary negligence. The term culpable or criminal negligence implies something more than simple carelessness. It means negligence that is blameworthy or carelessness that has in it an element of conscious indifference to the safety of others. I do not mean by this that a person must actually intend to do injury. It is enough if his conduct evinces a reckless disregard for the consequences likely to ensue."

No exception was taken to the instructions thus given, but the respondent did except to denial of various requests for instructions which would have placed before the jury principles applicable in determining negligence if it found that the respondent was called upon to act in an emergency not occasioned by his own fault. See *Carney* v. *Railway*, 72 N. H. 364; *Kardasinski* v. *Koford*, 88 N. H. 444. The contention is advanced that the emergency doctrine was the respondent's chief if not his only defense to the charge of which he was convicted.

The jury was fully instructed upon the fundamental issue of whether death resulted from the culpable negligence of the respondent. However, since by the terms of the statute "excusable . . . homicide" is not manslaughter, the respondent could properly assert the defense that he was engaged in a lawful act with lawful

intent when accidental death resulted without negligence on his part. Not every principle relating to the common law of negligence is relevant in a criminal prosecution such as this, and statutory language is frequently controlling. See *Commonwealth* v. *Gurney*, 261 Mass. 309; *State* v. *Peckham*, 263 Wis. 239. If the emergency doctrine may properly be invoked where criminal negligence is charged as tending to negative the existence of any negligence, its application must depend upon the same requirements imposed in civil cases, one of which is the existence of "evidence from which the jury could find that the actions of the person confronted with the emergency were affected by the stress of the occasion." *Frost* v. *Stevens*, 88 N. H. 164, 166. The evidence in this case failed to meet this requirement, and hence we do not reach the question of whether it could be found that the emergency was not occasioned by the respondent's fault, or the broader question of whether the doctrine may properly be applied in an appropriate criminal case. See *Commonwealth* v. *Gurney, supra*; *Commonwealth* v. *Vartanian*, 251 Mass. 355; *Ledford* v. *Commonwealth*, (Ky.) 246 S. W. (2d) 456; *Simcic* v. *United States*, (Mun. Ct. App., D. C.), 86 A. (2d) 98, 103. *Cf. People* v. *Boulware*, 41 Cal. App. (2d) 268; *Johnson* v. *Commonwealth*, (Ky.) 256 S. W. (2d) 527.

The respondent's evidence tended to show that the decedent, who was a pedestrian walking on the shoulder of the highway, was struck by the respondent's automobile after the respondent lost control of the vehicle; and that he lost control when he turned to the right shoulder of the road and simultaneously increased his speed substantially above forty miles an hour, in order to avoid collision with an automobile traveling in the opposite direction, which he claimed was partially in his lane of travel.

The respondent testified that he saw the approaching vehicle when it was six hundred feet away. He described what occurred, in part as follows: "[H]e had a good . . . three-quarters of the road and I kept looking at him coming my way, you know, and I didn't like the way very well and so I kept watching it. As we came I would say twenty-five, thirty feet he was cutting more on me so then I decided I either had to get out of the way or be hit face to face." His wife confirmed his testimony to the extent that she testified: "I was watching that car and the car seems right in the middle of the road coming towards us." The evidence was that the respondent then "stepped on the gas" and turned sharply to his right into a soft shoulder. Thereafter, in undertaking to return

to the highway he swerved sharply across to the opposite side of the road, turned and skidded to the right shoulder again, struck the decedent, knocked over a mailbox, ran over some rocks, left the road entirely and finally returned to it, traveling in all a distance of some four hundred feet from the time he first turned to his right.

If it were found that because of the course taken by the other automobile the respondent was called upon to act without time for deliberate judgment, still there was no evidence to indicate that he then "chose the wrong course of action, when alternatives were offered" or "failed to act in the only way open to him as quickly as he would otherwise have done." *Frost* v. *Stevens*, 88 N. H. 164, 167. *Cf. Bonenfant* v. *Hamel*, 96 N. H. 228. According to his own testimony, the emergency arose when only twenty-five to thirty feet separated the two vehicles. So far as appears he took the only saving action open to him, and took it with all possible speed. His judgment was not shown to have been affected by the excitement incident to the situation, or prevented from doing its best work. *Carney* v. *Railway, supra,* 372.

The fatal consequences resulted either from the prior negligence of the operator of the other automobile, as the respondent contended, or from the respondent's own negligence in driving at an extremely high rate of speed in the center of the road, as the State contended. In either event, what the respondent did after he first turned sharply to the right was unaffected by failure to then take a more prudent course than he did, because none was open. If his conduct was excusable it was because it resulted from prior misconduct on the part of the other driver, rather than because it proved deficient in a crisis. The evidence did not warrant application of the emergency doctrine. *Richards* v. *Company*, 96 N. H. 272, 276.

The only issue properly to be submitted to the jury on this branch of the case was whether the respondent's sudden change of course was caused by negligence of the driver of the approaching car, or by his own culpable negligence in so operating that no course except the one taken finally remained, if head-on collision was to be avoided. The jury determined the issue adversely to the respondent. The remaining exceptions have not been argued, and appear to be without merit.

*Exceptions overruled.*

All concurred.